Scott M. Riemer (SR5005)
RIEMER & ASSOCIATES, LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, NY 10016
Phone: (212) 297-0700
Fax:    (212) 297-0730
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

NICOLE KRIST,                                                                 19 CV 5896

                              Plaintiff,                          **COMPLAINT**

              -against-                                           ECF CASE

METROPOLITAN LIFE INSURANCE COMPANY,
CREDIT SUISSE SECURITIES (USA) LLC,
CREDIT SUISSE MEDICAL INSURANCE PLAN,
CREDIT SUISSE DENTAL INSURANCE PLAN, and
CREDIT SUISSE VISION INSURANCE PLAN,

                              Defendants.
-----------------------------------------------------------------------X

Plaintiff Nicole Krist ("Krist"), by her attorneys Riemer & Associates, LLC, complaining of

Defendant Metropolitan Life Insurance Company ("MetLife"), Defendant Credit Suisse Securities

(USA) LLC ("Credit Suisse"), the Credit Suisse Medical Insurance Plan ("Medical Plan"), the Credit

Suisse Dental Insurance Plan ("Dental Plan"), and the Credit Suisse Vision Insurance Plan ("Vision

Plan") alleges:

1.      This is an action arising under the Employee Retirement Income Security Act of 1974,

as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, to recover benefits due under employee benefit plans,

to clarify the rights of Krist to future benefits under such plans, and to recover attorneys' fees and

costs.

2.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29

U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this

Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §

1132(e)(2), in that the Defendants reside or may be found in this District.

## KRIST'S PARTICIPATION IN THE
## LONG TERM DISABILITY PLAN

4.      At all relevant times, Krist was and is a participant within the meaning of Section 3(7)

of ERISA, 29 U.S.C. § 1002(7), in the Credit Suisse Long Term Disability Plan (the "LTD Plan").

5.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan"

within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

6.      At all relevant times, MetLife is and has been the claims administrator of the LTD

Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

7.      At all relevant times, MetLife has been a fiduciary within the meaning of Section

3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

8.      Long term disability benefits under the LTD Plan have been insured in accordance

and pursuant to Policy No. **1145128-G**, issued by MetLife.

9.      Krist was employed as an Associate Investment Banker at Credit Suisse.

10.     As an employee of Credit Suisse, Krist was provided with long term disability

insurance coverage under the LTD Plan.

11.     The LTD Plan defines "Disability" or "Disabled" as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury,
you are receiving Appropriate Care and Treatment from a Doctor on a continuing
basis and you are unable to earn more than 80% of your Predisability Earnings or
Indexed Predisability Earnings at your Own Occupation for any employer in your
Local Economy. Your loss of earnings must be a direct result of your sickness,
pregnancy or accidental injury. Economic factors such as, but not limited to, recession,
job obsolescence, paycuts and job-sharing will not be considered in determining
whether you meet the loss of earnings test.

2

12.     The LTD Plan Defines "Own Occupation" as follows:

"Own Occupation" means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

## STANDARD OF REVIEW

13.     During the claims and administrative review processes, MetLife failed to comply with the Department of Labor's claims-procedure regulations, and its failure to comply was neither inadvertent nor harmless.

14.     Upon information and belief, MetLife has not adopted claim procedures in accordance with the Department of Labor regulations.

15.     By way of MetLife's procedural violations, MetLife forfeited its entitlement to any deference granted by the LTD Plan document.

16.     For these reasons, this case is subject to a *de novo* review.

## KRIST'S BACKGROUND AND DEGENERATIVE SPINAL CONDITIONS

17.     Krist is a motivated, hardworking, and accomplished young woman who is currently 31 years old.

18.     By 2017, at just 28 years old, she had already earned her Master of Science in Finance at Bentley University and became a highly successful Investment Banking Associate at one of the most prestigious global financial institutions, Credit Suisse.   In this capacity, Krist consistently was recognized as a rising star in her industry.

19.     Unfortunately, Krist's career as an Investment Banking Associate was cut short on May 3, 2017 due to worsening degenerative spinal conditions, including Scheuermann's disease and rapid degenerative disc disease, which necessitated two complex, major spinal surgeries in 2017.

20.     Scheuermann's disease is a genetic condition that limits the growth of cartilage endplate, causing osteochondrosis of the spine.  The condition usually begins in childhood.  *See* https://www.ncbi.nlm.nih.gov/pubmed/24468666.  *See also* copy in Administrative Record ("AR").

21.     "For most patients, Scheuermann's disease runs a fairly benign course, with resolution of symptoms at skeletal maturity.  However, . . . these individuals are more likely to have disk herniations in adulthood that may be neurologically devastating.  At the apex of the kyphosis, adults often have pain along with varying degrees of degenerative spondylolysis and spondylolisthesis.  The lumbar variant is more likely to be progressive in adulthood and more often symptomatic."  Amy O. Bowles & John C. King, *Scheuermann's Disease:  The Lumbar Variant*, 83 Am. J. Physical Med. & Rehabilitation467                                                                 (June 2004), https://journals.lww.com/ajpmr/fulltext/2004/06000/scheuermann_s_disease__the_lumbar _variant.10.aspx#JCL0-2.  *See also* copy in AR.

22.     "Surgery is rarely indicated in patients with Scheuermann disease.  The 2 [two] most common indications for surgery are spinal pain and unacceptable cosmetic appearance."  *See* https://now.aapmr.org/scheuermanns-disease/#references.  *See also* copy in AR.

23.     In Krist's case, she suffered rapid degenerative disc generation, multiple herniations and other spinal abnormalities, causing severe, widespread pain and limitations at the cervical, thoracic, and lumbar levels, in addition to other significant symptoms.  Her pain became unbearably severe with prolonged static positioning of her neck and back, as well as postural/positional transfers.  Surgery was recommended.

24.     On May 9, 2017, Krist underwent her <u>first major spinal surgery</u> – a multilevel lumbar laminectomy/discectomy at L4-5 and L5-S1.

25.     Just a few months later, on August 9, 2017, Krist underwent her <u>second major spinal</u> <u>surgery</u> – multilevel cervical decompression at C4-C5, C5-C6, and C6-C7, and laminectomy/fusion with instrumentation.

26.     Both procedures were performed by Todd J. Albert, M.D., a prominent and highly respected spinal surgeon.

27.     Dr. Albert is the Surgeon-in-Chief, Chief Medical Officer, and Korein-Wilson Professor of Orthopedic Surgery at the Hospital for Special Surgery in Manhattan.  Additionally, Dr. Albert serves as the Chairman of the Department of Orthopedic Surgery and Professor of Orthopedic Surgery at Weill Cornell Medical College.  Clinically, Dr. Albert specializes in the diagnosis and surgical treatment of spinal disorders.  He is known for using state-of-the-art technology and the latest surgical practices to preserve motion and enhance patient quality of life.

28.     Dr. Albert confirmed that "Ms. Krist's conditions are degenerative – the result of genetics, rather than an incident or injury," and "[t]he nature of her condition has worsened over time."  (Emphasis added).

29.     According to Dr. Albert, Krist experienced <u>no significant post-operative</u> <u>improvement</u>, despite extensive post-operative treatment modalities, including physical therapy (with home exercise program), chiropractic treatment, massage therapy, and avoidance of aggravating activities, such as prolonged static sitting and certain postural transitions.

30.     Indeed, Dr. Albert describes Krist's post-operative condition as "<u>failed back</u> <u>syndrome</u>."

31.     Post-operative diagnoses include:

a.     Degenerative Disc Disease;

b.     Scheuermann's disease;

c.     Status-post multilevel lumbar laminectomy/discectomy at L4-5 and L5-S1 (May 9, 2017);

d.  Status-post multilevel cervical decompression at C4-C7 and laminectomy/fusion with instrumentation (August 9, 2017);

e.  Schmorl's nodes and degeneration throughout her spine;

f.  Multi-segmental lumbar spondylosis;

g.  Multi-level moderate to severe degenerative changes of the lumbar spine (L4-L5 and L5-S1) with herniations and severe left lateral recess and foraminal narrowing;

h.  Multi-level discogenic cervical disc degeneration (C4-5 to C6-7) with left-sided neural foraminal narrowing ranging from mild to severe;

i.  Persistent disc ridge complex with focality in the right paracentral region, with bilateral uncovertebral osteophyte left side greater than right at the C6-C7 level;

j.  L5 lumbar radiculopathy;

k.  Disc herniation with osteophyte causing mild right canal stenosis at T1-T2 and T4-T5;

l.  Moderate right canal stenosis at T2-T3 and T11-T12; and

m.  Additional small disc herniations at other thoracic levels.

32.  From May 3, 2017 to date, Krist remains incapable of earning at least 80% of her pre-disability earnings in her own occupation because she suffers from numerous physical and cognitive symptoms, including:

a.  Severe intolerance for prolonged sitting and standing, together with other significant postural/positional intolerances, such as prolonged positioning of the neck;

b.  The need to change positions frequently and move around (*e.g.*, walking);

c.  Pain with postural transitions;

d.  Reduced musculoskeletal endurance and strength;

e.  Widespread spinal pain affecting her back and neck, as well as pain in her buttock, legs, and shoulders;

f.  Weakness in her upper and lower extremities;

g.  Stiffness, tightening, and soreness in the affected areas;

    h.   Excessive fatigue; and

    i.   Difficulty concentrating and reduced mental stamina due to severity of pain, fatigue, and poor sleep quality.

33.    In 2019, Dr. Albert confirmed:

    a.   "Ms. Krist's pain is constant, but some days are worse than others.";

    b.   "Her pain is aggravated with prolonged sitting, twisting, bending forward or backward, and being stationary.";

    c.   "Transitioning from sitting to standing is difficult and painful for her.";

    d.   "Her pain is improved by walking, which helps to relieve some of the spinal pressure and stiffness. Her pain is decreased, but not eliminated entirely, with walking, movement, and exercise.";

    e.   "Her symptoms are severe enough to interfere with sedentary work activities, activities of daily living, and her concentration on a constant basis.";

    f.   "She often requires assistance with food shopping, heavy chores, and cooking, due to pain.";

    g.   "She cannot drive more than short distances due to discomfort she experiences turning her head and from when entering/exiting the car.";

    h.   "Ms. Krist additionally requires frequent naps and the ability to frequently rest at will.";

    i.   "Her sleep is poor due to low back and neck discomfort, which increases when her pain is worse.";

    j.   "[C]omputer use increases her neck, shoulder and back pain and she is unable to keep her neck in a static position.";

    k.   "She must change positions frequently and move around (e.g., walking), which prevents her from meeting sedentary work demands on a consistent and sustained basis."; and

    l.   "She is unable to sit for more than 20 to 25 minutes at a time."

34.    A sit/stand desk option is not an appropriate accommodation that would enable Krist to return to her occupation. Specifically, a sit/stand option is not appropriate because standing

statically does not improve her pain and symptoms – Krist must be able to walk and move around.

Dr. Albert stated:

> Due to the nature of her pre- and post-operative conditions, standing statically does not improve her pain or stiffness such that a sit/stand desk could be an option. She must be able to move, stretch and walk around at time at least every 15 minutes – sometimes more frequently.

35.     Dr. Albert could not identify any viable accommodation options that would enable

Krist to work.

36.     Narcotic pain medications are neither effective nor appropriate for Krist's long-term

treatment. Indeed, Krist's post-operative pain responds better to activity modification versus narcotic

pain medications. Dr. Albert explained:

> The patient's pain responds better to activity modification (e.g, walking frequently and stretching at will) versus pain medications. The patient reports that pain medications did <u>not</u> significantly improve her pain, improve her sleep, or allow her to walk/move less. The pain medications cause significant side-effects (such as drowsiness, fatigue, upset stomach) without improving the patient's pain, physical abilities, and quality of life. Given that her condition has not improved status-post surgical interventions, I expect she will remain with pain over an extended duration (pending further treatment), narcotic pain prescriptions are not appropriate for this patient. The side-effects and significant risks, including addiction, outweigh the benefits. She must manage her pain with ongoing conservative care, activity modification, mindfulness, and injections for temporary breakthrough relief.

(Emphasis in original).

37.     Dr. Albert concluded that, due to her pain and other symptoms, Krist remains

incapable of performing her own occupation, and any sedentary role, on a sustained and consistent

basis since May 2017.

38.     Dr. Albert concluded that no further improvement is expected, and prognosis is poor.

Specifically, by letter dated February 26, 2019, Dr. Albert stated:

> Based on the diagnostic testing, my clinical findings and observations, and the [Functional Capacity Evaluation] results, Ms. Krist has <u>reached maximum medical improvement</u> unless further procedures are performed, and it is not yet known whether she would benefit from such. Her functional limitations are the result of her generative back conditions, <u>failed back syndrome</u> status-post surgeries, and ongoing

clinical abnormalities.  At this stage, status-post two spinal surgeries and failure of post-surgical treatment modalities, prognosis remains <u>poor</u>.

(Emphasis added).

39.    Krist's other providers agree with Dr. Albert's assessment of Krist's symptoms, status, and functional capacity.  These other providers include Krist's neurologist, Dexter Sun, M.D.; and Krist's chiropractors/physical therapists, Scott Iseman, DC and Douglas Seckendorf, DC.

<b><u>THE DEMANDS OF KRIST'S OWN OCCUPATION</u></b>

40.    Before becoming Disabled, Krist was earning approximately $175,000 annually as an Investment Banking Associate at Credit Suisse.

41.    Krist's occupation was extremely demanding.  She worked on an array of domestic and international transactions; executed mergers and acquisitions; raised capital for clients; guided companies through financial restructuring; discussed strategic alternatives geared toward competitive growth; and provided other advisory services.

42.    Physically, Ms. Krist's occupation required (without limitation):

    a.    Sitting at a desk for extended periods;

    b.    Using a computer for extended periods (*e.g.*, maintaining static positioning of her neck to use the screen, posture to use the mouse/keyboard for many hours, ongoing fine manipulation, *etc.*);

    c.    Frequent usage of a phone/other electronic devices;

    d.    Safely maneuvering in an office setting to converse with others, attend meetings, *etc.*;

    e.    Occasional travel; and

    f.    Unpredictable, long hours that often required "all-nighters" and weekend work.

43.    According to the job description provided by Credit Suisse, Krist's responsibilities included: (a) working with senior coverage officers to develop innovative solutions for client companies; (b) building complex models that help companies understand how they are valued by the

market; (c) following an industry to learn the key drivers and trends that influence those companies' decisions; (d) helping management teams craft the storyline to position their companies for sale; (e) traveling with clients on road shows and with senior bankers on site visits; and (f) building a network of colleagues both inside and outside of Credit Suisse that will strengthen the associate's career throughout her professional life.

44.     According to the job description provided by Credit Suisse, Krist's responsibilities and qualifications included: (a) MBA or equivalent degree with at least two years of experience;  (b) demonstrated academic achievement; (c) ability to work independently as part of a team;   (d) demonstrated ability to work in a time sensitive environment; (e) ability to multi-task with strong attention to detail; (f) demonstrated leadership abilities; (g) solid interest in the financial sector; and (h) excellent PC skills, including advanced knowledge of Excel, Word and PowerPoint.

## THE ADMINISTRATIVE CLAIM PROCESS

**MetLife Approved Krist's Short Term Disability Claim for the Maximum Duration**

45.     Prior to applying for LTD benefits, Krist applied for Short Term Disability ("STD") benefits with MetLife for the period beginning May 3, 2017 (several days before her first spinal surgery on May 9, 2017).

46.     MetLife considered, reviewed, and approved Krist's STD claim.

47.     Krist received STD benefits for the maximum benefit period from May 3, 2017 through November 3, 2017.

**MetLife Initially Approved Krist's Long Term Disability Claim**

48.     Krist also filed a claim for LTD benefits alleging she became disabled on May 3, 2017.

49.     On October 25, 2017, MetLife initially approved Krist's LTD claim and began paying her benefits as of November 5, 2017 (following the LTD Plan's 180-day unpaid waiting period).

**MetLife Terminated Krist's Long Term Disability Benefits**

50.     MetLife terminated Krist's LTD benefits effective March 28, 2018.

51.     MetLife's benefit termination letter states, "the medical [sic] no longer supports the restrictions and limitations preventing you from working in a Sedentary Occupation."

52.     MetLife's benefit termination letter also stated that Credit Suisse could provide "a sit/stand work station and ergonomic chair" as an accommodation.

53.     MetLife's benefit termination letter did not state that accommodations with a sit/stand desk and/or ergonomic chair would be appropriate and/or helpful for Krist.

54.     MetLife's benefit termination letter did not state that there had been any significant improvement in Krist's condition.

55.     MetLife's benefit termination letter did not discuss the specific duties of Krist's own occupation – merely generalizing her work as "sedentary."

56.     MetLife's benefit termination letter failed to state what specific information was missing and/or necessary for Krist to perfect her appeal.  On this front, MetLife's letter states only that, "If there is additional information, documents, or records that you believe would impact this benefit decision please submit it to us for consideration."

57.     MetLife's benefit termination relied on: (a) brief, non-probative surveillance that MetLife obtained; and (b) an unreliable report obtained from MetLife's non-examining paper reviewer, T.C. Barber, D.O., who concluded that Krist could perform sedentary work on a full-time basis.

The Brief and Non-Probative Surveillance

58.     MetLife, either directly or through a third-party, hired two private investigators to spy on Krist while conducting video surveillance.

59.     The two individuals concurrently conducted surveillance on Krist for three full days (approximately 26 hours of non-duplicative surveillance coverage over the course of February 26, February 27, and March 3, 2018).

11

60.     After the surveillance was conducted, MetLife received a "summary" report of the surveillance, which was prepared by the investigator.

61.     The surveillance summary report does not contain all information relevant to the video's reliability.

62.     MetLife never provided Krist with a copy of the complete, unedited and raw surveillance video footage.

63.     The video footage shows only short snippets of activity that account for a very small portion of the time Krist was under surveillance.

64.     Curiously, MetLife provided Krist with approximately <u>two (2) hours</u> of non-duplicative video footage (from each investigator) – accounting for approximately 8% of the total time surveillance was conducted (26 hours).

65.     Indeed, the surveillance does not document enough "activity" to demonstrate an ability to perform Ms. Krist's own occupation.

66.     The video provided to Krist does not show any activities demonstrating an ability to perform sedentary work activities (*e.g.*, sitting for prolonged periods of time and using a computer) on a sustained and consistent basis; an ability to perform the high-level cognitive demands of Ms. Krist's own occupation; an ability consistently complete a workday/workweek, or an ability to earn 80% of Krist's prior earnings.

67.     Of the two-hour video of "activity" recorded, Ms. Krist is purportedly only shown sitting for 17 minutes total, which was not even recorded consecutively.  Specifically, the video purportedly shows Ms. Krist sitting on two separate occasions – less than 10 minutes on February 26, 2018, and less than 7 minutes on February 27, 2018.

68.     The surveillance video does not show Krist standing statically for any extended duration.

69.     The other activities recorded (*e.g.*, walking, performing home exercises prescribed by her doctor in the park, light grocery shopping, *etc.*) are irrelevant to her disability claim and own occupational duties.

70.     None of the recorded activities were inconsistent with Krist's reported abilities or limitations, or the restrictions/limitations indicated by her physicians.

71.     Videotape surveillance that depicts such minimal activity does not substantially address Krist's ability to perform her own occupational demands, nor does it constitute substantial evidence to support termination of benefits.

72.     It was unreasonable for MetLife to rely on the brief surveillance of Krist performing activities that are neither relevant to her occupational duties, nor inconsistent with her reported restrictions/limitations.

The Paper Review Report of Dr. Barber

73.     Dr. Barber conducted a paper review of Krist's file (the "Barber Report") and concluded, "[T]he medical information did not indicate a condition of a severity to preclude work."

74.     Dr. Barber concluded that Krist had no work restrictions/limitations.

75.     MetLife relied on the Barber Report.

76.     MetLife's reliance on the non-examining report of Dr. Barber was unreasonable.

77.     Dr. Barber's non-examining report is unreliable because (without limitation):

  a.   Dr. Barber's opinion was infected by conflict and bias;

  b.   Dr. Barber's conclusions lack foundation and are conclusory;

  c.   Dr. Barber failed to consider the degenerative nature of Ms. Krist's condition and the lack of significant post-operative improvement;

  d.   Dr. Barber lacked appropriate qualifications to comment on Ms. Krist's spinal conditions (Dr. Barber is not an orthopedist, spinal surgeon, or neurologist);

e.   Dr. Barber <u>never</u> examined Ms. Krist in-person, which is particularly relevant, given the complexity of Mr. Krist's conditions and surgical procedures;

f.   Dr. Barber failed to consider all relevant information, including Ms. Krist's relevant own occupational demands;

g.   Dr. Barber failed to acknowledge that narcotic pain medications were neither effective nor appropriate for long-term treatment of Ms. Krist;

h.   Dr. Barber based his/her opinion on a summary report of the surveillance without personally watching the complete surveillance video footage; and

i.   Dr. Barber's conclusions were inconsistent with the weight of the evidence.

**<u>Krist Filed an Administrative Appeal</u>**

78.    Krist filed an administrative appeal of MetLife's benefit termination.

79.    On appeal, Krist argued that: (a) the evidence demonstrated that she was disabled from her Own Occupation; (b) the brief surveillance was irrelevant and inconclusive; and (c) Dr. Barber's non-examining report was unreliable, unsupported, and incomplete.

80.    With her appeal, Krist submitted substantial new evidence further demonstrating that she did not experience significant post-operative improvement; her conditions continued to render her disabled; and the potential accommodations mentioned by MetLife would not facilitate her return to work.  Krist's new evidence included (without limitation):

a.   An extensive, two-day-long Functional Capacity Evaluation performed at BEST Physical Therapy, which objectively confirms (without limitation):  diminished physical stamina; inability to tolerate prolonged static positioning, such as sitting and standing; frequent need to alternate positions at will; inability to keep the neck in a static position for extended durations; deficiencies involving use of her hands, especially with fine motor skills and grip; and the inappropriateness of a sit/stand

14

desk option (notably, some of the testing tasks were terminated at the evaluator's discretion for safety purposes);

b.  A statement from Dr. Albert, which detailed: the severity and degenerative nature of Ms. Krist's spinal conditions and related symptoms; the poor prognosis and lack of improvement, despite extensive treatment; the reliability of the Functional Capacity Evaluation results; the inappropriateness of long term narcotic pain medications for Krist's conditions; Krist's ongoing inability to perform the demands of her own occupation; why no reasonable accommodations could allow Krist to return to her own work at this time; and why the surveillance activities recorded were neither relevant nor inconsistent with Krist's functional disability.

c.  A statement from Dr. Sun, which detailed:  the ongoing severity of Krist's condition, symptoms, and limitations; the lack of significant improvement thus far; Krist's ongoing inability to perform the demands of her own occupation; and Dr. Sun's agreement with Dr. Albert's assessment.

d.  Updated MRIs of the lumbar, thoracic, and cervical spine, which each demonstrated significant clinical abnormalities;

e.  Updated treatment records from Krist's providers, which document ongoing symptoms, treatment, and clinical abnormalities;

f.  Statements from witnesses having personal knowledge; and

g.  Testimonial statements from Krist in affidavit form.

**MetLife's Review of Krist's Appeal**

81.  During MetLife's review of Krist's appeal, MetLife obtained a report from a second

non-examining paper reviewer, Roger Kasendorf, D.O. (the "Kasendorf Report"), who concluded that Krist could perform sedentary work.

82.    MetLife relied on the Kasendorf report.

83.    MetLife's reliance on the non-examining report of Dr. Kasendorf was unreasonable.

84.    Dr. Kasendorf's non-examining report is unreliable because (without limitation):

    a.    Dr. Kasendorf incorrectly stated that the clinical findings were "relatively benign";

    b.    Dr. Kasendorf unreasonably refused to credit the Functional Capacity Evaluation report because some of the testing tasks were terminated for safety purposes, even though Dr. Kasendorf admitted that the testing results were valid;

    c.    Dr. Kasendorf's opinion was infected by conflict and bias;

    d.    Dr. Kasendorf's conclusions lack foundation and are conclusory;

    e.    Dr. Kasendorf failed to consider the degenerative nature of Ms. Krist's condition and the lack of significant post-operative improvement;

    f.    Dr. Kasendorf lacked appropriate qualifications to comment on Ms. Krist's spinal conditions (Dr. Kasendorf is not an orthopedist, spinal surgeon, or neurologist);

    g.    Dr. Kasendorf never examined Ms. Krist in-person, which is particularly relevant, given the complexity of Mr. Krist's conditions and surgical procedures;

    h.    Dr. Kasendorf failed to consider all relevant information, including Krist's relevant own occupational demands;

    i.    Dr. Kasendorf failed to acknowledge that narcotic pain medications were neither effective nor appropriate for long-term treatment of Krist;

    j.    Dr. Kasendorf based his/her opinion on a summary report of the surveillance without personally watching the complete surveillance video footage; and

    k.    Dr. Kasendorf's conclusions are inconsistent with the weight of the evidence.

Krist's Providers and the Functional Capacity Evaluator Disagreed with the Kasendorf Report

85.     All four (4) of Krist's treating providers (Dr. Albert, Dr. Sun, Dr. Iseman, and Dr. Seckendorf) provided statements detailing the unreliability of the Kasendorf report, and their disagreement with Dr. Kasendorf's conclusions.  The provider of the Functional Capacity Evaluation, Susan N. Greenberg, M.S., P.T., also provided a statement detailing why Dr. Kasendorf's refusal to credit the FCE results was unreasonable.

The Response of Krist's Orthopedic Spinal Surgeon, Dr. Albert, to the Kasendorf Report

86.     First, Dr. Albert criticized Dr. Kasendorf's qualifications and lack of clinical familiarity with Krist, as follows:

> I specialize in the field of orthopedic spine surgery focusing on disorders of the cervical spine.  As a physical medicine and rehabilitation physician, Dr. Kasendorf lacks appropriate qualifications to comment on someone with failed back syndrome status-post two major spinal surgeries.  In addition, Ms. Krist is followed by a neurologist [Dr. Sun] and therapists who have all had the benefit of treating her frequently for a prolonged period of time. Dr. Kasendorf has not once examined Ms. Krist and is far less qualified to accurately assess her functional restrictions and limitations than myself and her other treating physicians.

87.     Second, Dr. Albert confirmed that Dr. Kasendorf was "incorrect" in concluding that there were hardly any abnormal findings.  Dr. Albert listed numerous abnormalities, as follows:

> Clinical findings and diagnostic testing include positive straight leg testing; radiological testing (including CT scans; EMGs; x-rays; and MRIs); operative report of the lumbar spine; and operative report of the cervical spine. Specifically, MRI of the Lumbar Spine (dated 8/17/18) demonstrated multi-segmental spondylosis and operative findings post discectomy at L4-L5 and L5-S1; MRI of the Thoracic Spine (dated 12/7/18) demonstrated disc herniation with osteophyte causing mild right canal stenosis at T1-T2 and T4-T5; moderate right canal stenosis at T2—T3 and T11-T12; and additional small disc herniations at other levels.  The MRI of the Cervical Spine (dated 12/7/18), demonstrated status post C4 through C7 ACDF; stable moderate right canal stenosis at C3-C4 with mild bilateral foraminal narrowing; stable mild left foraminal narrowing at C5-C6; stable severe left foraminal narrowing at C6-C7; and stable minimal prominence of the central canal.
>
> . . . .[O]n examination, I have found positive straight leg raising on the left, which recreates her leg and buttock pain. Straight leg raising on the right causes left sided pain. My repeated examinations also document one-quarter grade weakness along the

17

left tibialis anterior, localized neck pain, arm/leg heaviness bilaterally. She continues to undergo physical therapy with significant clinical abnormalities as well.

88.     Third, Dr. Albert criticized Dr. Kasendorf's unreasonable refusal to credit the valid

Functional Capacity Evaluation report.  Specifically, Dr. Albert stated:

> I disagree with Dr. Kasendorf's criticism of the FCE results because some tests had to be terminated. This does not invalidate performance on completed testing tasks. The fact that Ms. Krist could not safely perform some of the testing measures only serves to further support the severity of her functional limitation.  Ms. Krist passed all validity measures as Dr. Kasendorf admits.

89.     Lastly, Dr. Albert criticized Dr. Kasendorf's reliance on the surveillance, and

questioned whether Dr. Kasendorf personally watched the video footage:

> I also disagree with Dr. Kasendorf's conclusion that the surveillance supports an ability to work . . . .[T]he surveillance only shows Ms. Krist standing and sitting for extremely short intervals.  This is consistent with her condition, the FCE findings, and my assessment.  She was also seen walking and performing home exercises, which is neither inconsistent with her condition, nor relevant to whether she can perform sedentary work.  It does not seem to me that Dr. Kasendorf reviewed the videos.

The Response of Krist's Neurologist, Dr. Sun, to the Kasendorf Report

90.     First, Dr. Sun criticized Dr. Kasendorf's qualifications (*e.g.*, Dr. Kasendorf is neither a

spinal surgeon nor a neurologist) and lack of clinical familiarity with Krist.  Dr. Sun stated, "In

reviewing the [Kasendorf] report, it is clear that Dr. Kasendorf does not understand the complexity

of Ms. Krist's conditions, symptoms and resulting limitations . . . . Dr. Albert and I are more

appropriately qualified to comment . . . . I, together with Ms. Krist's other treating providers, can offer

a unique perspective that cannot be attained by reviewing records alone."

91.     Second, Dr. Sun confirmed Dr. Kasendorf was incorrect in concluding that there were

hardly any abnormal findings.  Dr. Sun commented, "It is possible that Dr. Kasendorf did not have

the opportunity to review all records, or that he did not have the opportunity to review them carefully,

but this young woman presents with significant findings." (emphasis added).  Dr. Sun detailed specific

abnormalities consistent with those noted by Dr. Albert (above).

92.     Lastly, Dr. Sun disagreed with Dr. Kasendorf's unreasonable refusal to credit the

Functional Capacity Evaluation results.  Dr. Sun stated:

> Dr. Kasendorf criticizes the [Functional Capacity Evaluation] largely because Ms. Krist
> could not physically perform several measures of testing.  The fact that she could not
> safely perform some of the testing measures only serves to further support the severity
> of her functional limitation.

The Responses of Krist's Chiropractors/Therapists, Dr. Iseman and Dr. Seckendorf, to the
Kasendorf Report

93.     First, Dr. Iseman and Dr. Seckendorf similarly disagreed with Dr. Kasendorf's

conclusions about an alleged lack of abnormal findings.  Dr. Iseman and Dr. Seckendorf stated:

> To the contrary, treatment and progress reports indicate significant tenderness over
> the trapezius and along cervical paraspinals with limited lumbar range of motion in
> flexion and lateral bending.  Objective findings included, but are not limited to,
> negative dural tension; [and] foraminal compression with Kemps.   Cervical
> compression is positive with axial cervical and lumbar pain re-production.  There is
> severe myofascial discomfort along the paraspinals, over central gluteal region and also
> over the trapezius musculature.

94.     Dr. Iseman and Dr. Seckdorf concluded:

> [T]his patient continues to experience significant abnormalities….causing severe pain
> and stiffness, particularly with sitting, standing, and sleeping….She also experiences
> great difficulty keeping her neck in a static position for prolonged periods.  Her pain
> is best managed by positional changes where she can move and walk at will.  She must
> do this often – typically every 20 minutes, but sometimes more frequently.  She often
> experiences pain with postural changes, as well.  Some days are worse than others.  She
> experiences some days where even walking is painful.  She experiences pain when
> transitioning (sitting to standing etc)… It remains unknown at this time as to when
> she would be able to return to work.

95.     Dr. Iseman and Dr. Seckdorf concluded that the Functional Capacity Evaluation

results were both valid and reliable.

The Response of the Functional Capacity Evaluator, Greenberg, to the Kasendorf
Report

96.     Greenberg, stated that "Dr. Kasendorf misunderstands the FCE process," and that he

criticized the results "without any sound basis for doing so."

97.     Greenberg stated that Dr. Kasendorf unreasonably refused to credit the report simply because some testing protocols were terminated for safety reasons.  Specifically, Greenberg stated:

> [T]here were only a few tasks which were not performed or stopped by the therapist for safety reasons only with the goal of not further injuring [Krist].  Preventing further injury – especially for complex spinal conditions with a recent surgical history and hardware – is a top concern and paramount priority.  The decision to stop several tasks was a decision made by the therapist for safety reasons and not due to subjective reports of pain….

> Dr. Kasendorf's attacks on this front are unnecessary and inappropriate.  Dr. Kasendorf cannot reasonably expect claimants and FCE providers to jeopardize their health and medical progress to complete tasks that they are physically incapable of completing without substantial risk to their health.  To do so would request claimants to jump through dangerous hoops to provide proof of disability, while simultaneously increasing their risk of further injury and regression of progress thus far.  It would be counterintuitive to assisting the claimant in his or her return to work where that may be an option with further treatment.  In fact, it would contradict the purpose of disability income protection at its core.

98.     Greenberg stated that Dr. Kasendorf cherry-picked from the report, noting that "[t]his 'cherry-picking' is inappropriate and does not support [Dr. Kasendorf's] conclusions."

99.     Greenberg concluded that the Kasendorf report is "grossly misleading and unfair."

**MetLife Upheld Its Benefit Termination on Appeal**

100.    On April 3, 2019, MetLife informed Krist of its decision to uphold its benefit termination.

101.    In doing so, MetLife unreasonably relied on the Barber report, the Kasendorf report, and the surveillance summary report, which are described above.

102.    In evaluating Krist's appeal, MetLife failed to adequately consider the medical evidence, the opinions of Krist's treating providers, the demands of Krist's own occupation, and Krist's subjective complaints.

103.    In evaluating Krist's appeal, MetLife failed to consult with a physician appropriately qualified to comment on Krist's complex post-operative spinal conditions.

104.    In evaluating Krist's appeal, MetLife relied on the opinions of biased, non-examining

20

physicians whose conclusions were incorrect, unreliable, and conclusory.

105.    In evaluating Krist's appeal, MetLife relied on the reports of non-examining physicians who commented on the surveillance without ever watching the complete surveillance video footage.

106.    In evaluating Krist's appeal, MetLife failed to conduct a vocational review to determine whether a sit/stand desk or ergonomic chair would be an appropriate accommodation to address her restrictions/limitations.

107.    In evaluating Krist's appeal, MetLife also failed to conduct a vocational review to determine whether Krist's restrictions and limitations would prevent her from earning more than 80% of her predisability earnings at her own occupation.

## KRIST'S PARTICIPATION IN THE MEDICAL PLAN

108.    As an employee of Credit Suisse, Krist elected to participate in the Medical Plan, issued by United Health Care Standard, which subsidized her premiums for medical insurance.

109.    At all relevant times, Krist was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the Medical Plan.

110.    At all relevant times, the Medical Plan was and remains an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

111.    The Medical Plan terminated Krist's benefits under the Medical Plan after MetLife terminated Krist's benefits under the LTD Plan.

112.    Krist subsequently incurred expenses to retain her medical insurance because she had to pay the full premium amount, which would have been subsidized under the Medical Plan.

## KRIST'S PARTICIPATION IN THE DENTAL PLAN

113.    As an employee of Credit Suisse, Krist elected to participate in the Dental Plan, issued by Delta Dental, which subsidized her premiums for dental insurance.

114.    At all relevant times, Krist was and is a participant within the meaning of Section 3(7)

of ERISA, 29 U.S.C. §1002(7), in the Dental Plan.

115.    At all relevant times, the Dental Plan was and remains an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

116.    The Dental Plan terminated Krist's benefits under the Dental Plan after MetLife terminated Krist's benefits under the LTD Plan.

117.    Krist subsequently incurred expenses to retain her dental insurance because she had to pay the full premium amount, which would have been subsidized under the Dental Plan.

## KRIST'S PARTICIPATION IN THE DENTAL PLAN

118.    As an employee of Credit Suisse, Krist elected to participate in the Vision Plan, issued by Carrier VSP, which subsidized her premiums for dental insurance.

119.    At all relevant times, Krist was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the Vision Plan.

120.    At all relevant times, the Vision Plan was and remains an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

121.    The Vision Plan terminated Krist's benefits under the Vision Plan after MetLife terminated Krist's benefits under the LTD Plan.

122.    Krist subsequently incurred expenses to retain her vision insurance because she had to pay the full premium amount, which would have been subsidized under the Vision Plan.

## METLIFE'S CONFLICT OF INTERST

123.    At all relevant times, MetLife has been operating under an inherent and structural conflict of interest because, on the one hand, MetLife is liable for benefit payments due to Krist and, on the other hand, each payment issued depletes MetLife's assets.

124.    MetLife's determination was influenced by its conflict of interest.

125.    MetLife's conflict of interest extended to and infected its non-examining paper

reviewers, Dr. Barber and Dr. Kasendorf.

**MetLife's Cozy Relationship with Dr. Barber and Dr. Kasendorf**

126.    Neither Dr. Barber nor Dr. Kasendorf are impartial physicians.

127.    Upon information and belief, Dr. Barber is an in-house medical consultant for MetLife.

128.    Upon information and belief, Dr. Kasendorf is an independent contractor hired and/or retained directly by MetLife, either directly or through a third-party vendor.

129.    Upon information and belief, Dr. Kasendorf and Dr. Barber have conducted reviews in connection with numerous other individuals insured by MetLife.

130.    MetLife knows, or has reason to know, that its in-house medical consultants and the medical consultants hired and/or retained to complete file reviews serve only insurance companies and never individual claimants.

131.    Upon information and belief, MetLife pays substantial sums of money to its medical consultants, whether in-house or independent contractors, to conduct reviews for MetLife's insureds.

132.    Because the medical consultants derive substantial income from performing file reviews for MetLife insureds, the medical consultants have an incentive to provide file reviews that MetLife deems favorable in order to perform future file reviews for MetLife.

**MetLife Has Not Reduced Its Conflict of Interest**

133.    MetLife has failed to take active steps to reduce potential bias and to promote accuracy of its benefit determinations.

## COUNT I (LTD Plan)

134.    Krist repeats and re-alleges the allegation set forth in paragraphs 1 through 134 above.

135.    MetLife had no legal basis for terminating Krist's LTD benefits.

136.    Under the terms of the LTD Plan, MetLife agreed to provide Krist with certain

disability insurance benefits under the LTD Plan, in accordance with the terms and conditions set forth therein.

137.    To date, MetLife has failed and refused to pay Krist the LTD benefits to which is she is rightfully entitled, from March 28, 2018 through the present date.

138.    Krist has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits.

139.    MetLife's determination that Krist is not disabled within the meaning of the LTD Plan is contrary to the terms of the LTD Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

140.    MetLife has financial conflicts of interest with respect to handling, monitoring, and eventually denying Krist's disability benefits.

141.    MetLife was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny Krist's disability benefits.

142.    The unlawful behavior of MetLife is evidenced by the following:

    a.    Denying benefit payments to Krist at a time when it knew that she was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

    b.    Unreasonably withholding payments from Krist knowing her claim for benefits was valid;

    c.    Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

    d.    Terminating benefits in the absence of medical improvement;

    e.    Ignoring Krist's treating providers' assessments of her medical conditions, and

how they restrict and limit her from earning more than 80% of her Predisability Earnings or Indexed Predisability Earnings at her own occupation, without any basis for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

f.  Relying on non-examining medical consultants to deny a claim supported by the treating providers;

g.  Relying on non-examining medical consultants who commented on the surveillance without ever actually watching the complete surveillance video footage;

h.  Relying on non-examining medical consultants to deny a claim supported by the diagnostic testing and objective medical evidence;

i.  Refusing to give appropriate consideration to the Functional Capacity Evaluation report, despite acknowledging the validity of the testing;

j.  "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions of Krist's treating providers regarding the conditions for which they render treatment;

k.  Failing to consult with a health care professional who has appropriate training and experience to comment on Krist's complex post-operative spinal conditions, in violation of 29 C.F.R. § 2560.503(h)(3);

l.  Failing to provide Krist with complete, unedited copies of the surveillance video footage, in violation of 29 C.F.R. 2560.503-1(h)(2)(iii);

m.  Completely disregarding Krist's subjective complaints, her own assessment of her medical conditions, and how they restrict and limit her from earning at least 80% of her pre-disability earnings in her own occupation, in violation of 29 C.F.R.

25

§2560.503-1(h)(2)(iv);

n.  Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of LTD Plan participants;

o.  Failing to provide a "full and fair review" as MetLife was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

p.  Failing to provide Krist with an adequate description of any additional material or information necessary to perfect her claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

q.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

r.  Failing to follow its own internal claims administration policies and procedures;

s.  Failing to conduct a vocational review to determine whether a sit/stand work station and/or ergonomic chair would have been appropriate for Krist, and whether she could earn 80% of her prior earnings in her own occupation;

t.  Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants; and

u.  Failing to give Krist a copy of the LTD Plan document and other materials relevant to her claim.

143.  MetLife's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Krist.

144.  MetLife breached its fiduciary duty by: failing to fairly review and reasonably interpret the Functional Capacity Evaluation report and the reports prepared by Krist's treating providers; failing to consider other material relevant to her medical condition; relying on the unreliable, incomplete, and inconclusive surveillance; and terminating benefits in the absence of medical

improvement.  Instead, MetLife created an artificial reason for terminating Krist's disability benefits.  MetLife selectively highlighted certain factors in medical reports in order to cast a favorable light on its position while ignoring the conclusions of Krist's treating providers and the Functional Capacity Evaluation about the conditions for which they rendered treatment/evaluation.

145.    MetLife breached its fiduciary duty to Krist by placing its financial interests in reducing its expenses and increasing its profitability above Krist's interests under the LTD Plan to receive disability benefits.

146.    A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), applies to evaluating the actions of MetLife in this case.

147.    MetLife was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

148.    MetLife violated the higher-than-marketplace standards that ERISA imposes on insurers.

149.    Krist has been forced to bring the instant action as a direct result of MetLife's unlawful benefit denial and violations of the LTD Plan and ERISA.

150.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Krist is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (The Medical Plan)

151.    Krist repeats and realleges the allegations of paragraphs 1 through 149 above.

152.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Krist is entitled to recover benefits under the Medical Plan that have not been paid to date and those that will become due in the future.

## COUNT III (The Dental Plan)

153.     Krist repeats and realleges the allegations of paragraphs 1 through 152 above.

154.     Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Krist is entitled to recover benefits under the Dental Plan that have not been paid to date and those that will become due in the future.

### COUNT IV (The Vision Plan)

155.     Krist repeats and realleges the allegations of paragraphs 1 through 154 above.

156.     Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Krist is entitled to recover benefits under the Vision Plan that have not been paid to date and those that will become due in the future.

### COUNT V (Attorney Fees and Costs)

157.     Krist repeats and re-alleges the allegations set forth in paragraphs 1 through 156 above.

158.     By reason of LTD Plan and Medical Plan's failure to pay Krist LTD benefits due under the terms of the plans, Krist has been forced to retain attorneys to recover such benefits, for which she has and will continue to incur attorneys' fees.  Krist is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Krist demands judgment against MetLife:

A.     For the amount of all long term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.     Clarifying and declaring that the LTD Plan is obligated to pay Krist long term disability benefits in the future as required by the LTD Plan;

C.     For the amount of all expenses incurred by Krist in order to retain her medical and dental insurance as a result of the Credit Suisse Plan's failure to subsidize her premiums, together with interest thereon;

D.     For the costs of this action and Krist's attorney's fees, pursuant to Section 502(g) of

ERISA, 29 U.S.C. § 1132(g)(1); and

      E.     For such other and further relief as may be deemed just and proper by the Court.

Dated:  New York, New York
         June 24, 2018

                    By:     /s/ Scott M. Riemer
                            Scott M. Riemer (SR 5005)
                            RIEMER & ASSOCIATES LLC
                            Attorneys for Plaintiff
                            275 Madison Avenue, 26th Floor
                            New York, New York 10016
                            (212) 297-0700
                            sriemer@riemerlawfirm.com